[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action of dissolution of marriage brought by the plaintiff against the defendant wife. The parties were married in September of 1983. This is a first marriage for the defendant and a second one for the plaintiff, whose first marriage ended in divorce in June, 1983.
There is one son issue of this marriage, Brian DeFeo, born April 20, 1986.
The plaintiff's first marriage broke up because he became involved with his present wife, with whom he had a relationship for two years prior to his divorce from his first wife. He had two children by his first wife, the second born while the divorce was pending in August of 1983, a month before CT Page 2317 he married the defendant.
The present marriage has developed problems centering around the defendant's jealousy of the plaintiff initially; then her hostility to his parents and that of his mother to her because she blamed the defendant for breaking up the first marriage. After several conflicts over the plaintiff seeing his parents or any other relatives of his and any contact with his ex wife in order to see his children, the defendant finally refused to allow the plaintiff to see his parents at all on penalty of her divorcing him. To prevent that the plaintiff acquiesced in her demands for about three years and did not see his parents at all. A telephone call from his mother after the death of a cousin apparently was the occasion for his beginning to see his parents without his wife's knowledge. Upon learning of that, the defendant became very upset calling him on the phone at his work and screaming at him that she was going to get a divorce.
In fact at one point divorce papers were served in 1985 calling for legal separation. However, the divorce was not pursued, and in April, 1986 the parties had their first and only child, Brian. For awhile the situation seemed better but then it deteriorated, and the plaintiff was ordered to pay additional funds to his first wife which his second wife resented. He also obtained another job in order to pay off the additional funds required. He apparently took other steps to keep away from home until he reached the point that he felt he could no longer tolerate the living conditions.
He then brought this action for the divorce in December of 1989.
It appears to the court that the marriage has broken down irretrievably and that the cause of the breakdown is, on the one hand, the defendant's jealousy and obsessive control of her husband's actions, particularly with respect to the people he sees in his own family and, on the other hand, the plaintiff's acquiescence in the defendant's demands. Consequently, the court finds that this is a no fault divorce.
The major issue in this case is custody of the son and the amount of support and the alimony, if any, to be awarded.
I. SUPPORT
The plaintiff works in Perkin-Elmer earning $968.41 a week plus an additional $58.00 a week from landscaping, for a total of $1,026.41. Social Security, FICA, health insurance, dental insurance income protection, supplemental life insurance, CT Page 2318 EAA-PE deductions amount to $483.49 a week leaving a balance of $542.92 available for support payments and alimony. The support guidelines dictate a minimum of $140.00 for support of a five year old child.
The defendant is presently not working. She claims that, if she did go to work, she would be paying day care and that would cancel her earnings. This is problematical since she has made no attempt to find employment or resources for caring for Brian while she worked.
At the time of her marriage she was earning eighteen to nineteen thousand dollars a year at Perkin-Elmer in the import/export department. It would appear to the court that she could find part time work at least. In fact during the marriage she did work part time on Monday nights for a limited time.
She does have her parents who appeared during the trial and agreed to act as facilitators for visiting by the plaintiff at their own home on Sundays and would in all likelihood be available for additional help as babysitters. There is also a day care facility in Milford which the defendant could use.
Until she gets work or finds other sources of income, the court would appear to be restricted to using the plaintiff's income as the basis for a support order. However, this would be reviewed in six months.
II. ALIMONY
The defendant has made no attempt to find work and apparently does not intend to do so until September. This impresses the court as a refusal to face the reality of the income available for both Brian's support and the support of the two children by a prior marriage. Plaintiff is already under a court order to pay $200.00 a week for his children from a former marriage, and the defendant was aware of this at the time she married the plaintiff. Another $150.00 a week for their child makes a total of $350.00 a week from a total net income of $542.92.
In addition, the defendant has asked that the plaintiff pay the mortgage of $815.00 a month or $189.53 a week. This would then reduce the total income of the plaintiff to $353.39 a week. The defendant is also asking that the plaintiff pay her $100.00 a week alimony or, with the mortgage, a total of $289.56 a week plus taxes, maintenance, and insurance on the condominium leaving the plaintiff a maximum balance of $253.36. CT Page 2319
It is not clear to the court how the defendant expects the plaintiff to live. It is clear to the court it is not possible for the plaintiff to pay the mortgage, the alimony and the support that the defendant requests. It is also clear that the defendant must seek a job or some other source of income to supplement her income and provide care for her child through her parents or the day care center or perhaps through permitting the plaintiff to babysit on occasions when he is available and she is not.
III. VISITATION
At present a major source of acrimony between the parties has been the visiting between the father and the child. While up until the separation, when Brian was three, there were no problems between Brian and his father, since the separation and since visitation has been on Sundays at the defendant's home and in the defendant's presence, there have been a number of problems centering around Brian's hostile attitude towards his father. This hostility has been expressed in kicking, calling his father "Joe" instead of "Daddy", yelling at him, telling him to go home and the like. However, it did appear to the court that this conduct was exacerbated by the presence of the defendant who remained in the home while the visitation was taking place from September, 1991, in total violation of a court order issued in January of 1991 — until this court ordered the parties to have a facilitator other than the defendant present.
The defendant's conduct in direct violation of the court order and her attitude towards her violation of that order is something less than acceptable. Should there be a continuance of that kind of disregard of court orders, the defendant may subject herself to severe penalties.
It does appear to the court that the defendant is over protective and engenders in her son the hostility he manifests towards his father, particularly when she is present. She also appears to be obsessively possessive. For one thing, she allowed the son to sleep with her for several months until advised by the family relations officer that this was not appropriate. It does appear that her hostility to the plaintiff is transmitted to the son, and when she is present during the visitation, he appears to be responding to her need to have that hostility exhibited.
On the other hand, the defendant is much too passive in his role, both with his son and with the defendant. His conduct it seems to the court invites the kind of conduct which his son and his wife are exhibiting. He needs counseling to enable him to act more appropriately and more effectively. CT Page 2320
It has apparently been agreed that there must be supervised visitation on a weekly basis from 12:00 noon to 5:00 p.m. on Sundays with a facilitator being one of the defendant's parents and with the visitation conducted at her parents' home. Any change in the place of the visitation or in the need for a facilitator must be determined by Dr. Pomeraniec, the psychiatrist treating Brian.
While having the facilitator for the visitation will be helpful and having visitation other than at the defendant's condo will be helpful, the fact is that nothing is going to make any major difference unless both parties are in therapy and make a real effort to improve their relations to each other and to their child. It is imperative that both parties be in counseling with accredited professionals. The plaintiff in particular should be involved in the counseling with his son with Dr. Pomeraniec and, in addition, should be involved in therapy with another doctor of his own choosing to enable him to act more appropriately both with respect to the defendant and his son.
The defendant, on the other hand, should be involved with a professional other than her present therapist who appears to have been more of a confidante than a treating counselor. In any event there appears to have been no change at all in the defendant's attitude throughout this case, and it is essential that that attitude change if the relationship between the two parties is to be improved.
IV. CUSTODY
On the question of custody, the defendant asked for sole custody and the plaintiff asked for joint custody. Absent an attempt at conciliation, the court must determine what is in the best interest of the child.
It appears that so long as the defendant has sole custody the plaintiff will have very little to say about anything concerning the child. His present visitation certainly reveals very little involvement in the child's life. While the best situation for joint custody is when the parents are friendly or at least treat each other civilly, it is in the child's best interest to have the kind of custody which permits both parents to be equally involved in the child's life to the extent possible. Joint custody would seem to be the only feasible means for accomplishing this end.
Up until now, the plaintiff appears to have had very little to do with the child's life except for his weekly, five CT Page 2321 hour visitation. Given the opportunity of having joint custody with the privileges and responsibilities that entails, will provide the plaintiff with that opportunity. A review in six months will determine whether or not it has been used for that purpose.
In determining the matters of alimony, support, custody and visitation, the court must consider the factors set forth in Connecticut General Statutes 46b-82. The court has considered some of those factors in the above discussion. In addition, the court considers the following:
1. Age and status:
 Both parties are in their 30's; plaintiff is 38 and the defendant is 35 years of age. They both appear to be in good health. They also appear to be living in rather modest circumstances although it is questionable whether they can continue to live as they are unless the defendant goes to work.
2. Income:
 The plaintiff's income, as discussed above, is not sufficient to support three families. On the other hand, his purchase of a car in 1991 for which he is paying $50.00 a week seems unwise given his responsibilities to both families. It would appear that he could defer those payments for a longer period since the balance on the car is $5,493.00 although he bought it less than a year ago.
 Both parties have been receiving money from other sources, the plaintiff from his parents who have been paying his rent and also the mortgage which he is obliged to pay under the pendente lite order; the defendant has borrowed from a friend and from her parents. However, despite the circumstances, the defendant has been able to save $300.00 while the plaintiff has not been able to save anything except through his company which has a savings plan and profit sharing plan, the balance of which is $3,000.00, and from which he receives income each year, this last year in the amount of $300.00.
3. Occupation:
 The plaintiff's occupation is that of a supervisor at Perkin-Elmer. The defendant is not working at the present time and has not worked since the birth of Brian in 1986 except for some part time work at night for a limited period. She plans to go to work in September but has made CT Page 2322 no effort to seek work at this time. Prior to Brian's birth, she worked at Perkin-Elmer earning $18,000.00 to $19,000.00 a year.
4. Advisability of mother working:
 While the needs of a five year old child require care from the mother or other custodial parent, the child presently is in school part of the time and could be placed in a latch key program for additional time if the defendant began to work full or part time. In the alternative, perhaps the defendant's parents, who have been most cooperative in helping to facilitate the visiting, could babysit part of the time. In addition, the plaintiff might be available for babysitting as well.
 The fiscal reality is that the plaintiff does not earn enough money to support three families.
Having now considered all of the elements enumerated in Connecticut General Statutes 45b-82, the court makes the following findings and orders:
1. The parties were married in September, 1983, in Westport, Connecticut.
2. Both of the parties were residents of this state for more than one year prior to the institution of this action.
3. The marriage has broken down irretrievably with no hope of reconciliation, and the cause thereof appears to be the total incompatibility of the parties with the plaintiff's somewhat passive, resistance to the defendant's need to control both him and their son. Consequently, the court finds this is a no fault divorce with the cause equally distributed between the parties.
4. CUSTODY: Despite the hostility between the parties, the court believes the best interest of the child is served by ordering joint custody at this time in order to insure that the plaintiff has an opportunity to be involved in his son's life. Physical custody shall be with the defendant.
Joint custody means the following:
 The defendant must consult with the plaintiff at all times with respect to any major decision concerning Brian's education, health, and recreation program, hospitalization or medical care. If after consultation the parties are unable to agree, then they must apply to the Family CT Page 2323 Services office for help in arriving at a solution, and they must abide by the decision of the Family Services officer who handles the matter or ask the court to resolve it. Joint custody further means that the day-to-day decisions shall be the responsibility of the parent having physical custody; that is, the defendant. Joint custody also means that the defendant must provide the plaintiff with all school reports, medical reports and any other reports relating to Brian's welfare within five (5) days after she has received the same unless the plaintiff advises her that he has received them from the school or the doctor or the hospital as the case may be.
 The plaintiff shall advise the school his son attends and his son's pediatrician and any hospital in which the son may be patient of his custodial status and request that he be given all information given to the defendant.
5. VISITATION: The plaintiff shall have the right to visit the child between the hours of 12:00 noon and 5:00 p.m. every Sunday at the maternal grandmother's home with one of the maternal grandparents present during the visitation. The visitation in the grandmother's home with one or more of the grandparents present shall continue until Dr. Pomeraniec recommends that the third party is unnecessary and/or that visitation may take place at the father's choice of location.
6. SUPPORT: The plaintiff will pay to the defendant the sum of $150.00 per week which is above the child support guidelines but has been requested by the plaintiff. The support order will be secured by a wage execution which will also include the present $35.00 a week to pay for an existing arrearage in the amount of $1,400.00.
7. ALIMONY: The plaintiff will pay to the defendant the sum of $100.00 a week as alimony and will also pay the mortgage, taxes, common charges, and hazard insurance on the property at 555 Swanson Crescent, Milford, CT until June 1, 1992. After that date, the plaintiff will pay one half of those charges and the defendant will be responsible for the balances.
 The alimony order will be reviewed in six (6) months to determine the extent to which the defendant has made efforts to or has obtained employment and the extent and character of the plaintiff's involvement with his child.
8. MARITAL HOME: The defendant and the minor child will continue to live at the marital home at 555 Swanson CT Page 2324 Crescent, Milford, CT, until the earliest of the following events: (a) the parties subsequently agree to the sale of the real property; (b) the minor child reaches the age of 18 at which time the property will be sold; (c) the defendant remarries or cohabits with a member of the opposite sex at which time the property will be sold.
 Until the occurrence of one of the above events, the title of said real estate shall remain in the parties. Upon sale, the net proceeds after the usual costs of closing will be distributed 55 per cent to the defendant and 45 per cent to the plaintiff.
9. UPKEEP. The defendant will be responsible for the upkeep of the real property, including minor repairs defined to be less than $300.00. Major repairs costing more than or equal to $300.00 shall be paid for by the parties in accordance with their respective interest in the said real estate as set forth above.
10. INSURANCE Plaintiff will maintain Physician's Health Services as medical insurance on the minor child as well as dental insurance through his employer which will include any necessary orthodontic work.
 Plaintiff will maintain his present policy of life insurance with the defendant named as beneficiary for so long as he is obligated to pay alimony.
 Plaintiff will keep his current health insurance and pay half of any additional premium necessary to keep the defendant insured in said plan pursuant to COBRA for the next six (6) months.
11. UNREIMBURSED MEDICAL EXPENSES Any unreimbursed medical or dental expenses for the minor child shall be shared equally by the parties.
12. HOUSEHOLD FURNISHINGS: The furnishings located at 555 Swanson Crescent, Milford, CT, will be property of the defendant.
13. PENSION AND PROFIT SHARING: Plaintiff shall keep all rights to his pension and profit sharing plan free of all claims of the defendant.
14. BANK DEPOSITS: Defendant shall keep those bank deposits listed on her financial affidavit.
15. MOTOR VEHICLES: The parties will each keep title to those CT Page 2325 motor vehicles listed on their respective affidavits.
16. LIABILITIES: The parties will each be responsible for the debts listed on their respective affidavits.
17. ATTORNEY'S FEES: The plaintiff will be responsible for the fee of the attorney for the minor child and will also contribute $2,500.00 to the defendant's attorney's fees. His interest in the former home could be the basis for obtaining funds for this purpose. The motion of counsel for the child for attorney's fees is hereby granted. Plaintiff is ordered to pay the same as hereinbefore set forth.
18. THERAPY: The parties will continue the minor's child therapy with Dr. Pomeraniec and cooperate in the therapy.
19. A wage execution order shall issue.
20. The parties shall return on September 15, 1992, at 10:15 a.m. to the Superior Court, 1061 Main Street, Bridgeport, Connecticut for review in accordance with this decision.
It is so ordered.
MARGARET C. DRISCOLL STATE TRIAL REFEREE